THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HECTOR RIVERA, Defendant-Appellant.

Third District    No. 3—85—0245

Opinion filed June 14, 1988.—Rehearing denied July 15, 1988.

Michael F. Braun, of State Appellate Defender's Office, of Elgin, for appellant.

Edward F. Masters, State's Attorney, of Joliet (Rita Kennedy Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:

Defendant, Hector Rivera, was convicted by a jury of murder, and the trial court imposed a sentence of mandatory natural life imprisonment pursuant to section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)). When the appeal first came before this court the cause was remanded to the trial court with directions that it conduct a hearing pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, to permit defendant to present evidence to substantiate his claim that there had been purposeful discrimination by the prosecutor in his use of peremptory challenges to exclude members of defendant's Hispanic race from the jury. (*People v. Rivera* (1987), 160 Ill. App. 3d 214, 513 N.E.2d 584.) After the hearing, the trial court ruled that defendant had failed to establish a *prima facie* case of such discrimination and the State was thus not required to come forward with a neutral expla-

nation for its peremptory challenges. We retained jurisdiction in the initial appeal to review the determination of the trial court, and both the State and defendant have filed supplemental briefs, together with the record of the "Batson hearing," in this court.

Defendant contends in his supplemental brief that: (1) the trial court erred in not finding that a *prima facie* case of discrimination had been established; and (2) since defendant was represented in trial by a black attorney, the trial court should have considered whether the prosecutor by peremptory challenge excluded blacks from the jury for discriminatory purposes. We will also address the issues raised by defendant in his original brief: (3) whether the State's use of peremptory challenges to remove minority jurors denied his sixth amendment right to a jury drawn from a fair cross-section of the community; (4) whether the State established defendant's guilt beyond a reasonable doubt; (5) whether the use of perjured testimony before the grand jury deprived the defendant of due process; (6) whether he was denied a fair trial because the trial court sanctioned lying under oath by a prospective juror; and (7) whether the statutory requirement for imposition of a mandatory life sentence violates due process and constitutes cruel and unusual punishment.

As pertinent to these issues, the record discloses that William Price, a Department of Corrections investigator at Stateville Correctional Center, testified before the grand jury relating to the participation of the defendant and his codefendant, Domingo Perez, in the killing of another inmate, Richard Cook. Officer Price's testimony related to the stabbing of Richard Cook during the showing of a movie to inmates at the correctional center and was based upon his investigation of the incident. Price had interviewed numerous witnesses during his investigation and also testified as to statements made by codefendant Perez. Officer Price stated that Perez had confessed to the stabbing of Cook and had implicated defendant in the killing. After Officer Price completed his testimony, the State recalled him before the grand jury to correct some misstatements in his testimony.

During jury selection, juror Dennis Jeglinski was examined in chambers concerning a traffic citation for which he had been placed on court supervision. The trial court told Jeglinski that during *voir dire* in open court, he could give a negative response to the court's question concerning prior arrests.

At trial, David Walker, a lieutenant at Stateville Correctional Center, testified that on the evening of April 16, 1981, a movie was shown to inmates in the gymnasium of the correctional center. Officer Walker observed nothing unusual during the movie, but afterwards he

saw inmates coming back into the gym. He went out of the gym into the tunnel to see what the problem was and observed another officer assisting an inmate, Richard Cook, who appeared to be injured. Cook went over to Domingo Perez, another inmate, pointed his finger at Perez and said, three times, "That is one of them right there." Cook began to fight with Perez but fell to the floor and was taken to the hospital.

Estee Hall, a captain of Stateville Correctional Center, testified that he heard noise in the main tunnel and, on investigating, observed Cook, who was bleeding from his chest. Cook came toward Officer Hall and pointed at defendant saying, "That is one of the son of a bitches who attacked me." According to Officer Hall, six or seven other inmates were standing behind defendant at the time Cook identified him. Officer Hall's report of the incident, however, stated that Cook was pointing in the direction of 15 individuals and did not mention that Cook pointed at defendant, saying that he was one of the persons who attacked him. Officer Hall also testified that he saw no blood on the defendant and no knife was recovered from him.

Anthony Beamon, an inmate at Stateville Correctional Center, testified that he observed Cook come out of the gym after the movie followed by seven Hispanic inmates. Beamon identified some of these men as Perez, whom he knew as Crazy Man, defendant, whom he knew as Spaulding, and men whose nicknames were Bogart and Gypsy. He said defendant was wearing blue pants and a yellow shirt. The Hispanic inmates surrounded Cook and began to stab him. Beamon testified that he saw three or four knives, and that defendant, Perez, and Bogart each had one. After the stabbing, these men ran out of the tunnel. Beamon stated that he was less than 50 feet from the group when they stabbed Cook and that defendant and his companions came close enough to him that they almost knocked him down.

Jason Davis, a lieutenant at Stateville Correctional Center, testified that when he went to investigate a loud noise in the tunnel he saw Cook coming towards defendant. Seven Latin inmates and one black inmate were standing behind defendant. Cook, who was bleeding profusely, pointed at defendant and shouted: "Get him. He's the one that did it." While moving toward defendant, Cook said, "Get him, the one in the black hat." Officer Davis testified that the one inmate in the crowd wearing a hat was defendant, although his report of the incident did not mention that Cook said anything about a hat. Officer Davis also testified that defendant was wearing blue jeans, a T-shirt, a sweatshirt, and a skull cap; he saw no blood on defendant

and did not see a knife.

Jerry Wilson, an inmate, testified that in May 1983 he was transferred to Stateville Correctional Center and assigned a cell near the defendant's. Wilson stated that the defendant confessed to the killing of Cook. According to Wilson, defendant told him that he, Crazy Man, and an inmate named Sammy, who were all members of the Latin Kings, stabbed Cook because Cook was a member of a rival gang called the Simon City Royals. Wilson denied that he received anything in exchange for his testimony, but acknowledged telling the defense investigator that he would not testify unless the State did something for him.

Dr. Edward Shalgos, a pathologist who performed an autopsy on Cook, testified that his examination disclosed four stab wounds, and, in his opinion, two and probably three different instruments were used in the stabbing.

Pierre Clark, defense counsel's investigator, testified that Jerry Wilson told him that he would not testify unless the State did something for him and that he had cooperated with prison officials in the past by providing information and helping them find weapons.

Defendant testified in trial that on the evening Cook was stabbed defendant was wearing blue pants, a blue shirt, and a blue jacket; he was not wearing a cap. He said that when he left the gym after the movie he observed a scuffle in the tunnel. He saw Cook, who was bleeding, pointing in all directions saying, "Get him," and that Cook was not specifically pointing at him. Defendant denied telling Wilson that he killed Cook or that he was a member of the Latin Kings.

Dr. Michael Caufman, a pathologist, testified that based on his review of the autopsy it was his opinion that one weapon could have caused all four of Cook's wounds, but that it was possible that more than one weapon was used.

I

Although this cause was remanded to the trial court for the purpose of permitting defendant to present evidence to substantiate his claim on appeal of improper discrimination by the prosecution in exercising its peremptory challenges, defendant offered no evidence at the hearing. Instead, his counsel stated to the court that as two jurors having Hispanic surnames had been challenged in jury selection, Miss Sanchez and Mr. Rojos, defendant's burden of establishing a *prima facie* case of discrimination had been met. Defendant's counsel acknowledged that he had not been present during selection of the jury and referred for his facts to the transcript of the *voir dire* examina-

tion of the veniremen. The State responded that it was, at that point, unaware of exactly what racial group defendant is a part and the racial groups of the potential jurors, in particular whether the juror, Miss Sanchez, was of the same racial group as defendant, and the State challenged defendant's *prima facie* argument based upon surnames of the veniremen.

Defendant's counsel responded, correctly, that in *voir dire* Mr. Rojos had stated he was of Hispanic origin, but that the question was not asked of Miss Sanchez. Counsel argued that as the only two jurors of the Hispanic race were excused by the State, defendant's burden was met.

After further comments by counsel and the court relating to the judge's notes, and his recollection that both parties had accepted a Latino juror named Dennis Alcollo, the court made findings based upon the evidence before it, "without regard to the potential of other Latinos who may have been accepted," that the two jurors excused by the State were the only Latinos on the 60-person panel examined and such evidence was insufficient to establish a *prima facie* case of racial discrimination.

Defendant contends on appeal that evidence of the removal of the only Latino members of the venire by the State requires it to come forward with a neutral explanation for the challenges. He relies upon *People v. Parker* (1988), 166 Ill. App. 3d 123, 519 N.E.2d 703, and cases from other jurisdictions. In *Parker*, the court, in *dictum*, stated that the challenge of a single juror who was the only member of defendant's race on the panel suggested a "pattern" of discriminatory strikes and was sufficient to raise a *prima facie* case. We need not here consider whether *People v. Parker* was correctly decided as it is apparent, in the present case, that no evidence was offered by defendant to establish that all members of his racial group were excused from the jury by the State.

■ Before a *prima facie* case of racial discrimination under *Batson* can be established, the record must reflect the racial composition of the jury and the race of the veniremen peremptorily challenged by the prosecutor. (*People v. Partee* (1987), 157 Ill. App. 3d 231, 268, 511 N.E.2d 1165.) In addition, a defendant must articulate why he believes that the challenge of a juror was evidence of discrimination in jury selection. (*People v. Chevalier* (1987), 159 Ill. App. 3d 341, 350, 512 N.E.2d 1001.) Here, defendant relied solely upon the fact that two persons with Spanish surnames had been peremptorily excused by the prosecutor, *i.e.*, Miss Sanchez and Mr. Rojos. While the transcript of the *voir dire* does establish that Mr. Rojos was Hispanic, it

did not suggest the racial origin of Miss Sanchez, and no evidence was offered to establish she was Hispanic, other than her surname.

The record makes clear the prosecutor's basis for the challenge of Mr. Rojos, who stated in *voir dire* that he may know relatives of defendant and might be prejudiced for defendant because defendant was Hispanic. Mr. Rojos also said that because he was a Latin-American, he did not know whether he could be a fair and impartial juror in this case. It is apparent that the prosecutor excused Rojos because of his prejudices, not because of his race. While the basis for exclusion of Miss Sanchez is not apparent from the record, it was not shown that she was of the same race as defendant, nor can an inference be fairly made that she was excused because of her Hispanic surname, in light of the fact that other persons named Partipilo, Alcamo, Anzelc, Patanella and Tapia served as jurors in defendant's trial.

We conclude that defendant failed to establish a *prima facie* case of discrimination under *Batson v. Kentucky*. Mere reference to Spanish-appearing surnames was not sufficient to raise an inference of the discriminatory use of peremptory challenges, and the juror here who was shown to be of the same race as defendant was clearly excused by the State for his prejudice in defendant's favor.

## II

■ Defendant also contends that because he was represented by a black attorney, the trial court should have considered whether the prosecutor improperly challenged unspecified black jurors. Claimed errors must be brought to the attention of the trial court in a post-trial motion and must also be preserved for review in the initial brief filed by a party or are deemed waived. (*People v. Warmack* (1980), 83 Ill. 2d 112, 128, 413 N.E.2d 1254.) Defendant failed to raise this issue, as required, and it is waived. See *People v. Holder* (1987), 153 Ill. App. 3d 884, 886, 506 N.E.2d 407.

■ In any event, we reject the argument that because defendant's lawyer was black the peremptory challenge of black jurors by the State was subject to *Batson* standards. We find the argument illogical and without a basis in the *Batson* decision, which relates only to circumstances where members of "defendant's race" have been systematically excluded from the venire. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723; see *People v. Crowder* (1987), 161 Ill. App. 3d 1009, 1013, 515 N.E.2d 783.) As stated in our prior opinion in this cause: "Under *Batson v. Kentucky*, this defendant may not establish a *prima facie* case of purposeful racial discrimination in selection of the jury by evidence that blacks, or members of minority ra-

cial groups other than Hispanic, were excluded by peremptory challenge." (*Rivera*, 160 Ill. App. 3d at 216.) We note too that it has been held that *Batson* is not applicable merely because a defendant's attorney was black. See *Smith v. State* (Ala. Crim. App. 1987), 515 So. 2d 149, 150.

## III

■ Defendant also contended in his original brief that peremptory challenges to remove black members of the venire violated his sixth amendment right to be judged by a jury drawn from a fair cross-section of the community. Defendant has waived this issue, which he raises for the first time on appeal, as he made no claim in the trial court that his rights under the sixth amendment had been violated. (*Holder*, 153 Ill. App. 3d at 886.) We also note that the United States and Illinois Supreme Courts have declined to extend the fair cross-section requirement to the petit jury. *Lockhart v. McCree* (1986), 476 U.S. 162, 174, 90 L. Ed. 2d 137, 148, 106 S. Ct. 1758, 1765; *People v. Holland* (1987), 121 Ill. 2d 136, 158, 520 N.E.2d 270.

## IV

The defendant contends next that his guilt was not established beyond a reasonable doubt. He points to inconsistencies in the testimony of Anthony Beamon and Officer Davis regarding what the defendant was wearing at the time of the stabbing, the fact that Beamon's testimony as to the presence of the inmates known as Bogart and Gypsy at the scene of the stabbing was uncorroborated by the correctional officers and contradicted by the defendant, Beamon's lack of credibility, the fact that no blood or weapon was found on the defendant, Wilson's lack of credibility, the fact that Officer Hall's report of the stabbing stated that Cook was pointing in the direction of 15 inmates, and the fact that Officer Hall did not indicate that the defendant was wearing a hat while Officer Davis testified that Cook wore a hat at the time of the stabbing.

■ When there is a challenge to the sufficiency of the evidence in a criminal case, the question on review is whether, after examining the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) It is the function of the jury to weigh testimony, judge credibility of witnesses, and determine factual matters in debatable sets of circumstances. (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) A reviewing court may not substitute its judgment

for that of the trier of fact. *People v. Kline* (1982), 92 Ill. 2d 490, 505, 442 N.E.2d 154.

■ Applying these principles here we cannot agree that the evidence was insufficient to establish defendant's guilt beyond a reasonable doubt. He was identified by an eyewitness, Anthony Beamon, who had ample opportunity to observe the stabbing; Officers Hall and Davis testified that the victim, Richard Cook, had identified defendant as one of the persons who stabbed him, and another inmate, Jerry Wilson, testified that defendant told him that he had stabbed Cook.

## V

The defendant next contends that he was denied due process because his indictment was obtained from the perjured testimony of Officer Price. The State argues that defendant has waived his right to challenge the alleged use of perjured testimony before the grand jury by failing to move to quash the indictment. (*People v. Baxton* (1957), 10 Ill. 2d 295, 298, 139 N.E.2d 754.) Defendant responds that if the issue is waived it was the result of his counsel's ineffectiveness. We find the issue waived and that defense counsel was not ineffective.

■ ■ In order to show that his counsel was ineffective, defendant must establish that he was prejudiced by the alleged ineffectiveness. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) The failure of counsel to make a motion does not necessarily result in a finding of ineffective assistance of counsel. (*People v. Hancock* (1983), 113 Ill. App. 3d 564, 574, 447 N.E.2d 994.) In this case, even if defense counsel had made the motion to quash the indictment it would not have been granted since an indictment need not be dismissed when no intentionally false or misleading evidence was presented to the grand jury. (*People v. Bragg* (1984), 126 Ill. App. 3d 826, 830, 467 N.E.2d 1004.) In his brief, the defendant fails to establish that Officer Price's testimony before the grand jury was perjured. Instead, defendant apparently claims only that evidence at his trial was not introduced to support all of the grand jury testimony presented by Officer Price; this does not amount to perjury.

## VI

■ Defendant asserts that he was denied a fair trial because juror Dennis Jeglinski was advised by the trial court that he could give a negative response to the court's question concerning prior arrests during *voir dire* in open court. This contention is waived since defendant failed to object in the trial court and failed to include the

issue in his post-trial motion. (*People v. Julian* (1980), 89 Ill. App. 3d 60, 63, 411 N.E.2d 337.) We also reject the defendant's argument that this circumstance is plain error under Supreme Court Rule 615(a). 107 Ill. 2d R. 615(a).

## VII

■■ Defendant finally contends, for the first time on appeal, that section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)), which mandates the imposition of a natural life sentence if a defendant has previously been convicted of murder or is found guilty of murdering more than one person, violates due process and constitutes cruel and unusual punishment. Although defendant failed to raise the issue in the trial court we will address it under the plain error doctrine. 107 Ill. 2d R. 615(a); see *People v. Morissette* (1986), 150 Ill. App. 3d 431, 442, 501 N.E.2d 781.

The argument that section 5—8—1(a)(1)(c) violates due process and constitutes cruel and unusual punishment has been rejected by the Illinois Appellate Court. (*People v. Boswell* (1985), 132 Ill. App. 3d 52, 60-62, 476 N.E.2d 1154, *rev'd on other grounds* (1986), 111 Ill. 2d 571, 488 N.E.2d 273; *People v. Wilson* (1985), 139 Ill. App. 3d 726, 743, 487 N.E.2d 1015; *People v. Denson* (1985), 139 Ill. App. 3d 914, 926-27, 487 N.E.2d 777, *appeal denied* (1986), 111 Ill. 2d 591.) We adhere to these decisions.

Accordingly, the judgment and sentence of the circuit court is affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.